Has Mr. Cedrone here? You are? Yes. Okay. I just think in this case it's better to give the government an opportunity to respond  and put orders on it. You put them together. I think there is, in looking at this there are enough differences that that, you know, they're 10 minutes. Okay. We just, before Mr. Epstein gets up, we just consulted here. What I'm going to propose is that, is it Ms. Carrillo? Yes. Ms. Carrillo, if you don't mind, after counsel for Mr. Cunningham presents his argument, perhaps you could take 10 of your 20 minutes and respond in the Cunningham matter, and then sit back down and then let Mr. Cedrone handle the Carter argument, and you'll get another opportunity to address the Carter issue. This is it. Very well. Okay. Mr. Epstein. Thank you, Your Honor. May it please the Court, my name is Robert Epstein. I'm here today on behalf of the appellant, Mr. Maurice Cunningham. With the Court's permission, I'd like to reserve two minutes of my time for rebuttal. That will be granted. Thank you, Your Honor. The issue on this appeal is whether there was sufficient evidence to convict Mr. Cunningham for the drugs and the gun found in his co-defendant's backpack. A backpack that Mr. Cunningham never touched, never handled, never looked inside. A backpack which the police saw in three places that day. On Mr. Carter's back, in Mr. Carter's car, and in Mr. Carter's house. And what the police also observed was that when Mr. Cunningham ran out of drugs that morning to sell on the street, he was replenished not from the backpack, but from his own stash of drugs that he had in a lot down the block. Now we would submit on these facts, and under these circumstances, the evidence is clearly insufficient to convict Mr. Cunningham for the items found in his co-defendant's backpack. And this is a critical issue for Mr. Cunningham. Because the small amount of drugs that he sold on the street that day, he was looking at a sentence of about a year under the guidelines. Instead, he got a five-year mandatory sentence for the crack and other drugs in his co-defendant's backpack, and a five-year sentence on top of that for the gun. For a total of ten years, rather than just one. The case law on this issue is overwhelmingly in Mr. Cunningham's favor. We decided no less than six circuit court decisions, including this court's decision in Garth, which makes clear that Mr. Cunningham was not properly accountable for the gun in his co-defendant's backpack. And that case law, the reasoning of that case law, extends completely to the drugs found in Mr. Carter's backpack as well. Mr. Epstein, you say that the case law is overwhelmingly in your favor. Would you concede that there's a distinction in the case law between the drug issue and the gun issue? I.e., the case law is more favorable to you with respect to the gun than the drugs? I would not concede that, Your Honor. I think the case law that we cite with respect to the gun, the reasoning of that case, extends completely to the drugs here as well. What the case law makes clear is there has to be evidence of knowledge on Mr. Cunningham's part of what is in his co-defendant's backpack. We don't have that here. In addition to knowledge for purposes of constructive possession, what the case law makes clear is that there has to be evidence that Mr. Cunningham had the power to exercise dominion and control over his co-defendant's backpack. We don't have that here. And for aiding and abetting, in addition to knowledge, from the court's view, there has to be strong evidence of knowledge to a practical certainty for aiding and abetting. In addition to that kind of evidence of knowledge, they have to show some type of act, some type of participation with respect to the backpack that shows that Mr. Cunningham wanted to facilitate Mr. Carter's possession of the items within that backpack. We have nothing like that here. So I think the case law in Garth and Torres Maldonado and Powell from the D.C. Circuit, Williams from the 5th, Thomas from the 11th, completely supports us not only with respect to the gun but with respect to the drugs as well. Government comes back with only one case, and that's EFLS. EFLS did not address gun at all. There was no 924C count in that case. There was no gun in that case. And EFLS really highlights the deficiencies of the government's evidence in this case with respect to the drugs as well. Because let's look at EFLS. EFLS is where the defendant drove to a drug transaction in his car with the drugs in his trunk of his car. He engaged in what was clearly counter-surveillance driving maneuvers, drove into the parking lot very slowly, drove out, drove back in, parked in an area where no other cars were located, where it was supposed to be only for the employees of the hotel. The co-defendant gets out, does the drug transaction, gets the drugs out of the trunk of the car, calls EFLS on a cell phone. At the moment, the deal is consummated, and they leave. That is so different than what we have here with respect to the drugs in Mr. Carter's backpack. EFLS would be on point if what happened here was that Carter and Cunningham walked to Cunningham's car, not Carter's car. They get into the car, they drive to a drug transaction, they engage Mr. Cunningham, drives the car in some kind of counter-surveillance technique, and then they go do a drug transaction. We have nothing like that here with respect to the drugs in Mr. Carter's bag. I know Mr. Carter had the keys. Does the record reflect that this was Mr. Carter's car? The car was apparently unregistered. But the keys to the car was Mr. Carter. Mr. Carter was the one who opened the trunk. Mr. Carter was the one who put the backpack on the trunk. At page 122 of the appendix, you'll see that Mr. – I'm sorry. It was at page 277 of the appendix. Cunningham was simply on the sidewalk waiting for Carter. And then they go and they walk away, wherever it was they were going to. They were walking away from Carter's house at that point. At pages 1 through 4 of your brief, you repeatedly referred to Cunningham as an employee of Carter. I think that's the most plausible hypothesis based on these facts. Well, if he's an employee, then wouldn't it almost perhaps not necessarily follow, but at least logically and sufficiently follow that he was aiding and abetting Carter's drug possession, particularly in light of the similar packaging of the drugs in the backpack and the drugs that Cunningham was found to be dealing? Your Honor, I think the opposite conclusion follows from the – if Cunningham – and I think the evidence strongly suggests that Cunningham is the employee. He's the low man on the totem pole. He's the guy on the street making the hand-to-hand sales. He's the one most vulnerable to arrest. It's commonly known that people in that position won't know where their superior, where their boss was keeping their drugs, what their amount of drugs are. In fact, just yesterday – I understand that that could be the case, but here you've got concerted action. You've got the two of them going into the same house. You have them together chasing away the person they perceive to be helping the government. How do you get around that? Well, because that's completely consistent with Cunningham simply being a street-level guy who makes sales on the street. You have somebody who comes to that house, the C.I., who violates the code of the street there. He's trying to make – he's coming to the door. He doesn't know any of these guys. They chase him away. That doesn't mean – and Carter is the one who yells at him. Carter is the one who then knocks down the person in the street who directs him. All Cunningham does is follow him outside. But even assuming Cunningham is involved in that, if that's the case, that doesn't mean that Cunningham knows what's in the bag. That doesn't mean he knows that Carter has a drug. That doesn't mean he knows that Carter has a much bigger stash of drugs in the bag. I agree with you as a matter of logic, but it seems to me the difficulty you have is that we've got to view the evidence in the light most favorable to the government as the verdict winner. Certainly. I'm agreeing with you that it's not necessarily the case, but that's not our frame of reference, is it? Well, as you said, the government gets the benefit of the doubt here. You view the evidence in the light most favorable to the government, your own doubt. But as this court recently said in Suffs, the beyond a reasonable doubt standard demands, does not allow convictions based on one of several equally plausible possibilities. The government has to have evidence that shows that their theory is the more plausible one. I was looking at this case of United States v. Whitefield yesterday, and it's not cited on our briefs, and I apologize for that. It's at 89 F. Suffs 2nd, 587, and I'm referring to page 90. I provided counsel for the other side with a copy of the case this morning. It's a case where a DEAH had testified for the government at 17, and what he said was, and the court quote just refers to his testimony, typical relationship between low-level sellers and their superiors. And if you look, by the way, at the government's brief in the Carter case at page 23 of the government's brief, they refer to Carter as the evidence suggesting that he is the superior here, that he is the senior member here. And what the DEAH says, in this case Whitefield, is that superiors frequently conceal the true drug quantity from the street seller. And that's DEAH testimony, and that's commonly understood. So if Cunningham is Carter's employee, he's not going to know, in all likelihood, what Carter has and where he's keeping it, whether he keeps it in his car, in a bag, in the house. He wouldn't necessarily know that. And the government, while they get the benefit of the doubt, while the evidence is viewed in the light most favorable of them, they have to show that their theory is at least more plausible than that posited by the defense. Okay, Mr. Epstein, we'll have you back on rebuttal. Ms. Carrillo. Maria Carrillo for the government in Napoli, Your Honor. It's Carrillo? Carrillo. The two L's are like a Y. Carrillo, okay. Thank you. The question before the court today, Your Honor, Your Honors, is whether this jury was so irrational that giving all the inferences to the government,  It is not a standard that is used by the defense to determine whether or not that counsel has suggested about competing inferences. The standard is clear, and counsel has also suggested in his brief, and I quote from page one of his reply brief, that the essential question is which of the scenarios is more plausible. Because if the government's hypothesis is not more likely, then Mr. Cunningham's convictions on counts three and four cannot stand. This is simply flat-out wrong. The law of the land has been settled, and the Supreme Court in Jackson v. Virginia, and I quote from that decision, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecutor, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We are not here to talk about competing inferences. We are here to talk about whether the government's inferences were reasonable. This is a very deferential standard of review, and the Supreme Court in Jackson v. Virginia made clear why it is so deferential, because it preserves the domain of the jury. The jury was the one who had the witnesses. Ms. Carrillo, we understand the standard of review. Let me ask you about the gun issue, if I might. Other than Agent Cohen's testimony that firearms are prevalent in the drug business, what evidence is there that Mr. Cunningham was aware that the gun was in the backpack? Your Honor, the evidence shows that he is aware of both the gun and the drugs and the accoutrements that were inside the bag. There are 10 pieces of evidence that connect him to the contents, to the inside of that bag, beginning with, and they all must be viewed together, beginning with his actions of selling crack cocaine that morning. We have testimony, this is conceded by counsel, that he's selling crack cocaine in front of that house at least six times in 40 minutes, and it is in front of Carter's house. It is not in a lot. It is not next door. It is in front of Carter's house. And that crack cocaine is packaged in the same fashion as the crack found in the backpack. Exactly, Your Honor. And what about the gun? And that would be my third point, is the crack files. Where can you point us to the record where Cunningham knew about the gun? And, Your Honor, I'm building to that, just like in the Ifillice case, it's a grain-by-grain analysis, but certainly there are at least 10 key points of evidence here, and that is that the vials are identical to what is found in the bag, at least the 153 crack vials with pink tops that are found inside the bag. But together with those vials is found pretty much every tool that you can imagine for drug trafficking. We have a bowl with residue. We have two scales to weigh the drugs. There's marijuana. There's powder cocaine. There's loose marijuana. There's packaged marijuana. And there is crack cocaine, and there is a loaded hand, a loaded firearm, with an obliterated serial number that's found right there in the midst of all those other tools. So they have to be viewed together. Certainly, Your Honor, I'll continue with the other pieces of evidence that connect him to. . . So far I still hear you saying that guns go with drugs like peanut butter goes with jelly, and I think the precedents say that that's not enough. Intuition isn't enough. My understanding is you've got to point to something in the record that shows that Cunningham had knowledge that the gun was in the bag. Your Honor, the knowledge here is proven by the relationship with Carter. The two of these men worked together. Cunningham, it's uncontested, was selling the crack cocaine. But throughout all of this case, what we see is two men working together. Cunningham was selling the crack cocaine. Is there any testimony about that relationship? Did any of the officers testify that their investigation indicated other than that morning that Cunningham and Carter worked together in this drug organization? Your Honor, certainly they testified to what they saw, what they personally observed. I said other than their testimony involving that morning. Was there any other testimony about their working relationship? Other than their observations, no, Your Honor. It would simply be based on their observations. But again, there are many critical pieces of observations or evidence that tie these men together that show that they're working in concert to promote their drug trafficking. Well, help me with that because I don't . . . Now, what else is there that suggests to you that they're, quote, working together? Well, certainly, Your Honor, Mr. Cunningham is selling drugs openly at 9.30 in the morning in front of Carter's residence. Mr. Cunningham was in the drug business. Yes, and then, Your Honor, very significantly, Carter's talking to him throughout this time that he's openly selling drugs. After the first transaction, Carter comes and talks to him on the porch. And then Carter leaves, returns with the book back, talks to him again. So Carter knew that Cunningham was selling drugs. That's clear. And then, in addition, Your Honor, Carter goes into the house. And at this point, Cunningham continues to sell transactions 2, 3, 4, 5, and 6. And then he enters the home. At that point, something very significant happens, which is the police officer sending the CI. And this is very significant because immediately, and the testimony is clear, these two men see this as a threat, which, in fact, it was. It was a threat to their business. And they act aggressively. They chase him. They threaten him. They curse at him. And they chase him with the intent to assault him. But they're diverted by this other person who says, oh, that guy sent him to you. So they assault him. And then the person who's assaulted says, I'm calling the cops. At that point, all the men return to the house. And then what happens? Shortly thereafter, they leave. And when they open the door, they look. They look to see if the coast is clear. Because at that point, they're together. Wait a minute. You're saying that they thought this was a controlled purchase, but they didn't think it was being surveilled. No, Your Honor. What I'm saying is that the testimony is clear, that what they said is you're not from around here. Don't ever come back here again. Maybe they thought it was a police officer, an undercover C.I. Maybe they thought it was somebody that was just a threat to them because they didn't know. But in any event, that's important that there are two inferences that you can draw there. Mr. Carter had been busted for selling drugs, what, several months before. And the last thing in the world he wanted to do was to have anything to do with the drug trade. And when somebody came and said, you're a drug dealer, sell me drugs, he went bananas and said, get the hell out of here. I'm in enough trouble already. I mean, that's just an inference that's just as plausible as the one you're saying, that they thought that they weren't being surveilled until they went out and somebody said they were going to call the police. We really don't know what caused them to react the way they may well have been fearful that they would, as far as Carter's concerned, may well have been fearful that he would be mistakenly accused of drug dealing. Well, respectfully, Your Honor, the testimony as to Mr. Carter having been arrested before was not before the jury. So it would not have been an inference before the jury. That was at the motion to suppress that was offered. So although there may have been other competing inferences, the standard here is, was it a rational inference by the jury that these men would have perceived this to be a threat to their business? They've already been seen acting in concert while Cunningham is selling the vials. And ultimately, the vials that are found in the backpack confirm that they've been acting in concert because, in fact, he's selling what's coming out of that book bag. But after the threat, what is significant, Your Honor, is that they open the door and they're together because if Your Honor remembers earlier in the case, Cunningham enters the house with the book bag by himself. But when he leaves following the threat, he leaves with Cunningham. And they look, they look both ways. Three different times in the record, the testimony is they look both ways. And these men are not crossing the street, Your Honor. They're walking down the sidewalk and they're moving the book bag that has their stash and all their accoutrements of their enterprise down the sidewalk, around the corner, to a car, to a place of safety where the house, they don't know if the police are coming because this man has just said, I'm calling the cops. You just assaulted me. So they're getting out of there. And that inference that the jury could draw is supported by the evidence. Now, when they get to the car, Carter has the keys. He opens the trunk. He puts the bag in there. Cunningham is right there, two pairs of eyes, and they're securing their stash in the car. Now, when the items are recovered, that's when we see they're identical to what has been sold before by Mr. Cunningham. And what does that tell us? That Mr. Cunningham has been inside that bag, in that bag that contains all of the accoutrements of his drug trafficking together with Mr. Carter's. He's been inside that bag. He himself supplied himself with those vials, and he could have availed himself at any moment to get back in that bag, walking with Mr. Carter while he's in the house with Mr. Carter, at all of those moments. So why is the wrapping, the packages, show that, who knows, that they come from a same source, that these two guys were getting drugs from the same source, or that Carter was Cunningham's source? It could be, Your Honor. Those are competing inferences. But you said just because the packaging was the same meant that Cunningham knew what was in the bag, beyond a reasonable doubt. Well, certainly, Your Honor, those are competing inferences, and those are rational competing inferences. But the question before the court is, was the jury's inferences toward the government? Is it a rational inference? And I would cite or actually argue that Garth and Cartwright support the government's position here. This is not Garth, and this is not Cartwright. And if we could just take a moment to visit Garth and Cartwright. In Cartwright, it's a lookout. And the concern of the court was that, as a lookout, there's knowledge that there's an illicit transaction, but that there's no knowledge proven that he knows what's in that bag. But imagine if Cartwright had packaged drugs on him that matched identically to what was in that plastic bag that his co-defendant sold in that car. And imagine if Cartwright had engaged in hand-to-hand transactions before they were arrested. Then it would, I would suggest, have been a different decision. Now in this case, with Garth as well, the concern of the court was the defendant admitted he knew there was cocaine inside the bag, but he didn't say anything or exert any control over the bag. But here, the fact that Cunningham is actively doing hand-to-hand buys with distinctively packaged vials, in the context of this concert of action with his co-defendant, tell us that he's been in that bag. And in that bag are all the tools of the trade. A loaded handgun with an obliterated serial number is very significant. It's a tool just like a scale. All right, Ms. Carrillo, I think that you're going over some ground you already covered. I think we understand your position on this. Thank you, Your Honor. I would just close with the question is whether this jury was so out of the bounds of reason that their verdict cannot stand. And the answer would be it was a rational jury. It was a rational verdict. And the government asks that you affirm the decision. Mr. Epstein. Your Honor, what this court's case law in the sufficiency area makes clear is that no rational trial or fact can find guilt beyond a reasonable doubt where the government's theory is no more plausible than the defendant's. And if you look at Cartwright, for example, this court acknowledged in Cartwright the government's hypothesis could be correct. That Cartwright knew that it was drugs, that he was a drug transaction that he was serving as a lookout for. The court said, of course, that could have happened. It was a real possibility. But so could countless other scenarios that do not lead to the inference the government seeks to draw. It's not sufficient for the government to throw some evidence out there that might lead to a possible inference. They have to show that their theory is truly a more plausible one. Otherwise, a rational jury cannot convict beyond a reasonable doubt. I mean, in the Jenkins case, it was certainly a possibility that Mr. Jenkins, who was seated more plausible. It's a 51 percent test. I thought it was no rational juror. Well, I think no rational juror can't. I don't think the rational juror test could be met if the government hasn't even satisfied a preponderance standard in the case. If their evidence doesn't even suffice for preponderance, then no rational juror can convict beyond a reasonable doubt. But in Jenkins, I mean, he was seated on a. . . But it sounds. . . I want to parse this with you a little bit. Because it sounds like your argument, Mr. Epstein, is if there are two choices. . . Let's say that the government presents a set of facts, A, and the defense presents not A. Well, there's, in logic, right, there's a 50-50 chance. It sounds like you're arguing that if the government finds the defendant's versions of the facts not credible and adopts version A, that that is insufficient because that can't possibly be beyond a reasonable doubt because there are at least two choices. Isn't that what you're trying to argue? Well, what I'm arguing is that, yes, when the evidence goes at least equally, if not more so, to the defense version, then no, the jury cannot convict there. I mean, there are two sets of facts, but they have to choose one. There's a conflict, so they choose one, and they say we find facts A beyond a reasonable doubt. Right, and what this court said in the TOLA, 72 F. 3rd, page 780, where all the substantial evidence is consistent with innocence as with guilty, it's the duty of the appellate court to reverse a judgment of conviction. So if the evidence leaves us in equipoise, 50-50 either way, then this court has said it's this court's duty to reverse the conviction. And quite frankly, I think the theory that's presented by the defense in this case is actually far more plausible than what's been put forward by the government. As far as the prosecutor referred to several times that Cunningham must have been in the bag. I mean, the evidence is completely the contrary. When Cunningham ran out of drugs to sell, he did not go to the bag. He went to his own stash. There's nothing to show that Mr. Cunningham ever was inside of that bag. And in Garth, where the defendant knew there were drugs in the bag, knew that he was taking the drugs to a drug deal in the bag, and a gun is in the bag, the defendant is still not accountable for the gun. And that would be good for the gun to go. Thank you. Okay. On the U.S. v. Carter matter, we'll call Mr. Cedrone. Good afternoon. My name is Mark Cedrone. May it please the court, I represent Rakeem Carter on this matter. I'd like to reserve two minutes of my time for rebuttal, and I'd also like to make an unusual request and see if Judge Stapleton would argue my case for me. And I'd actually like to pick up exactly where Judge Stapleton left off. I had the benefit of hearing, obviously sitting through the argument, and hearing how much evidence there was that Carter and Cunningham worked together. Our primary issue in this case are suppression issues. Although we've argued insufficiency of the evidence with respect to the gun, I'm going to rest on the brief there, and I'm not going to make any additional argument on that. But in this instance here, there is certainly a lack of probable cause to arrest Rakeem Carter. In addition, there was a lack of probable cause to seize the vehicle. Let's go over the facts of the case. What happens here is approximately at 9.30 in the morning, there's this drug activity that's being observed by this Officer Henry. It's Cunningham who's doing it. There's no evidence that Carter's even observing the drug activity. If you read the record carefully, the first drug transaction happens at 9.30, and then there's evidence that Officer Henry seized Rakeem Carter. Then there are several other drug transactions that happen with no reference to Rakeem Carter. Then Carter leaves the house, goes up the street, comes back with the green bag, and goes into the house. Now there are several more drug transactions, and including then there's the Harry Bennett transaction, the one with the BMW. The individual is arrested. I think that becomes the basis of count two with which Mr. Carter is not charged. Then there is the white car transaction. This is a significant transaction. It's amazing how two defense lawyers can argue the significance of a particular fact, but have a different significance. It has to do with the re-upping. This is the re-upping transaction. This is the transaction where Carter, or Cunningham, goes to the lot, gets the drugs. He doesn't go into the house where the green bag is, where the cops observed the green bag. He goes to another location. This is a clear indication that he is not working with Cunningham, that Carter is not working with Cunningham. Wouldn't that be a better argument if you didn't have them acting in concert to chase away the CI, going together into the house, coming out of the house together, going to the car together? Well, Your Honor, I would ask Judge Stapleton to respond to that. The reaction to the person coming to the desk or to the door can very well be, hey, get off of my step. Don't come here asking for drugs. I got busted in August. It's now December. I'm probably, although not in the record, I'm probably under bail for that case right now. Could be, but the jury didn't see it that way. Right now, Your Honor, I'm not arguing insufficiency. I'm arguing the possible cause here and what the police officers know and so forth. So the police officers know that he'd been arrested, and I guess that's a fact that probably counts in the government's favor here. But there's nothing to suggest that they are working together, and the REopt transaction is very, very important. Then they call for the confidential informant, and then the confidential informant incident happens. And there's the chasing. And I suspect, and I know if I have two minutes of rebuttal, I'll address what I think my colleague on the other side of the table is going to say. But what the cops also heard is that they heard that Carter had a gun. He didn't observe it, but he heard it. And he heard it through this triple hearsay, although admissible at the suppression hearing, that the confidential informant tells another police officer who radios it to Officer Henry that the man in the tan dickies has a gun who is ostensibly his car. The reason I raise that now is because I want to point out that if the court looks at the district court's factual findings, and that, candidly, I would concede that's a fairly significant fact for the probable cause determinations here. If the court looks at the district court findings, the district court implicitly rejected that because that fact is not in the district court findings. But yet, it's a fact of record. And all the district court does is he credits the officers' observations. He does not credit everything. He says, I credit their observations. And if it helps, actually, at my appendix, APP 17, where the findings are, and all the district court finds, I'm sorry, it's APP 16, all the district court finds with respect to, forgive me, it's APP 17, with respect to the C.I. transaction is that the C.I. knocked on the door of the address and was chased from the porch of the house by Cunningham, Carter, and at least one other man. No reference to Lander and Carter ostensibly had a gun. And this is in the district court's findings as it relates to the probable cause determination. So I suggest that that's an implicit rejection of that particular component of it. But in any event, then what we have is we have Carter and Cunningham going up the street, and Carter's carrying the car, the bag, and then there's an observation. And I would challenge my friend on the other side of the aisle to show in the record where it's, because I think she said it in the earlier argument, that Carter is seen placing the bag in the car. All he's actually seen is closing the trunk. It's a logical inference that he placed the bag in the car, if he certainly has it. And then what happens? He's arrested. So what is he arrested for? Well, oh, and interesting, there's actually a tacit admission, in my view, by the police officers involved in this case, that at the time, they didn't even see Carter as having done anything illegal. And that tacit admission actually comes in both what the district court finds, which is an accurate recitation of the testimony of Officer Henry. When Officer Henry, the observing officer, directs the police, sends over a radio call to arrest Carter and Cunningham, he refers to Cunningham as the target and Carter as the guy carrying the bag. Well, interestingly, there is not a single iota of evidence in this case up to this point in time. Not until the search happens. Actually, looking at the bag, that creates any nexus between that green bag and illegal activity. None whatsoever. And this is the significance of the REopt transaction. Because when the person who is selling drugs on the street, in plain view of the police officer, needs to REopt, he doesn't go where the green bag is at that time. Instead, what he does is he goes to some parking lot somewhere and REopts. So there's nothing to suggest. Now, so they arrest Carter illegally. They seize a key from the car. So that key should not have ever, the evidence about that key, should not have come as evidence at all. So it's an arrest without probable cause. However, what else do they do? They seize the vehicle for six hours. The arrest happens at approximately 10.30 in the morning. It's about 4.30 in the afternoon by the time that the drug dog comes to do its sniffing. And during that time, they have a uniformed police officer guarding the vehicle. Now, maybe that's not akin to taking the vehicle to some impound lot. But that is, in fact, a seizure. And, in fact, the record reveals that a couple of times, some people may have tried to get to the car and the police officer had to shoot them away. So we have a seizure of a vehicle without probable cause. And then the dog sniffs. An unregistered vehicle, by the way. Correct. Police have every right to take off the street forthwith. Your Honor, I don't believe the— Why would your client have standing to challenge the seizure of the car if he has no possessory interest in it? Well, he certainly has a possessory interest. He has the keys. He's in the car. And maybe it's not unregistered. Just because it's unregistered doesn't mean it's his. The evidence certainly suggests it's his. He has dominion and control over the vehicle for standing purposes. But isn't Judge Fischer right that if a car is unregistered that they have a right to take it? Your Honor, I have to concede I don't know the answer to that. The answer is yes. Well, they didn't take it, though. They left it. You're arguing that they took it and they held it for six hours. They certainly seized it for Fourth Amendment purposes. Okay. And what's really— But they didn't search it until they got the warrant. I'm not sure I understood what your argument was as to the seizure of the car because they didn't search that car until they got the warrant. So to the extent that Mr. Carter has standing to claim the search, you have to attack the search based on the affidavit, not the seizure. I disagree because they seized the vehicle. And then, again, the probable cause as a result of the— Where did the dogs sniff the vehicle? On the street. On the street. So they had the testimony about the dogs being alerted to the presence of narcotics. That's one of the things that went into the affidavit. Yes, sir. My time is up. Your time is up. You have two minutes left, though. Yes, sir. Okay. Ms. Carrillo? Ms. Carrillo, I do have one basic question that concerns me in this case. What was Mr. Carter arrested for? Your Honor, Mr. Carter was arrested for the selling of drugs. He wasn't charged for that. No, Your Honor, and ultimately he was not. But the probable cause that went to his arrest included all the concert of action, which was Cunningham's sales, as you know. But now is when the officer's knowledge as to his prior history also kicked in, Your Honor. So anybody who's been previously arrested is subject to being detained if the police officers see them under certain circumstances without any other information? As long as those circumstances to the officer, to a reasonable officer, indicate that he's a person who's committing a crime. And in this case, that's what was happening. The officers were watching for well over 45 minutes. They were seeing Cunningham openly doing these transactions in front of Carter's house. Again, that's significant. These are row homes. He's not next door. He's not in a lot. He's in front of Carter's home. He's communicating with him throughout these sales. And then, of course, with the threat that comes in, we really see their enterprise or their team kicking in. They've got to move these drugs. And ultimately, the officers at that point don't know for sure what's in the bag, but the circumstances are certainly indicating to them under a totality of circumstances that what's inside is drugs and that Carter is very much a part of this open-air drug selling that's going on. They see them leaving the house, checking to see whether the coast is clear, carrying the bag together to the car, putting it in the trunk, and at that point they're arrested. And with respect, again, at this point it is important, the prior history that we touched upon earlier, that they had just months earlier arrested Mr. Carter. He had drugs on his person in that arrest, and he also had a duffel bag with drugs inside. Your Honor, just assuming for argument that a warrantless, that you find it's not founded, which of course we don't concede, the only things that are taken from him at that point are the key and the currency. At that point, Your Honor, the officers hold the car, and even though the government's position is they could have searched the car at that point for probable cause. The bag is being put in the car, all the circumstances leading up to. Let me stop you right there. I'm not sure you were conceding this, but just for purposes of, I'm not even sure you were alluding to conceding it, but just for purposes of discussion, let's assume that we found that Mr. Carter's arrest at that time was illegal, okay? But we know everything else, and the jury eventually heard everything else in his case. Subsequent to that arrest, they searched the car, and we know how they searched the car. With a search warrant. Yeah. Was that search, as it applies to Carter, the fruit of the poisonous tree? No, Your Honor, it would not be. The officers had brought the dog in. The dog had a positive hit, and so there's more than abundant probable cause at that point, separate even from the arrest, which really the only fruits would have been the keys and the currency. And the search warrant, Your Honor, although it omits the prior history of Carter, it includes the positive hit of the dog in there, and of course the other circumstances, there are observations of the dealings, there are observations of the actions in concert, the leaving to put the items in the car, and certainly, Your Honor, ultimately with respect to the search warrant, there is the good faith exception under Leon that even if, and there's been no argument by counsel that this was anything facially wrong with the affidavit or the search warrant. I thought the question had to do with fruit of the poison tree, though. I mean, if they had not seized this vehicle when they seized it, it wouldn't have been there, or at least it wouldn't have been in the same condition when they finally brought the dog to sniff. Well, certainly, Your Honor. There were people who came to take possession of the car or whatever, or whatever was in the car. Your Honor, even under Terry's review here, they can hold that car briefly because the circumstances certainly. If they had probable cause to believe, at the time they seized the car, if they had probable cause to believe that there was contraband inside, clearly yes. But if they didn't. Yes, Your Honor, and I would argue also as well as even if they have reasonable suspicion, that is they can hold it briefly until the dog comes, and at that point it blooms into probable cause. But certainly the government's position is that the probable cause was there even before the dog arrived, that these are, this is good police work. These officers are taking every step to build their case carefully. They didn't need to bring the dog. They bring the dog. They didn't need to get a search warrant. They get a search warrant. And so for all those reasons, Your Honor, the government believes this is good police work. This is, in the government's opinion, not even a close call. We'd ask the court to affirm the district court. Thank you, Ms. Gregory. Thank you, Mr. Cedron. Just very briefly, it is, the car becomes the fruit of the poisonous tree because, as Judge Stapleton suggested, Mr. Carter had the keys. If he wasn't arrested and there's no reason to seize the car or to stop the car or do anything with the car. Except they did see, I mean, there was, clearly there was testimony. There was testimony that they saw the roof or the trunk lid up. They saw Carter and Cunningham standing next to the car. There's dispute as to whether or not, there's testimony as to whether they saw them put something in the car. But they clearly didn't see the green book, the green bag that Carter was carrying with him. So they could infer that it was somewhere else. Correct. Knowing that, they didn't need the keys. That all assumes that there's some nexus to illegal activity in that green bag. And there is none. And again, that's the significance of the re-op transaction. That green bag is just, all they see is it goes into the house, out of the house, and into the trunk. That's it. Well, but you do have Cunningham with Carter. That's correct. Fraternization, you're right. There's mere fraternization. But you know what Cunningham was doing from your clear observations by Officer Henry. The real question here is whether or not they had the right to bring the drug dogs in to sniff that car. And it's not as black and white as you had tried to describe. Well, and I want to make it even less black and white as the court would like it to be. Because I just perused the record and I can't find, I mean, I know it was said earlier that the car was unregistered. But it's not in the search warrant application. And I don't believe there was any testimony about the registration of the car. So I don't know that the car was necessarily unregistered. And I would end on that point also, Your Honor. Let me ask one other question. Mr. Cunningham argues vigorously in his reply brief that he was Mr. Carter's employee in the drug trade. That's what the facts show. Why isn't that enough for the police to arrest your client? That assumes Mr. Epstein is correct.  I don't agree. I know you don't agree, but how can you say that the judge in denying the suppression motion couldn't have rationally concluded what Mr. Cunningham argues is true? Because I think Mr. Epstein's argument is as irrational as the district court's argument, sir. Thank you, Mr. Cunningham. And we thank all counsel for cases that have been very well argued. We'll take the matter under advisement.